PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1267
_____

LEON DRUMMOND; LEE WILLIAMS, On behalf of
themselves and all others similarly situated;
YESHONDA DRIGGINS

v.

PROGRESSIVE SPECIALTY INSURANCE CO;
PROGRESSIVE ADVANCED INSURANCE CO,
                                                    Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. Civil No. 5:21-cv-04479)
District Judge: Honorable Elizabeth T. Hey
_____

Argued on November 8, 2024

Before:  KRAUSE, BIBAS, and SCIRICA, *Circuit Judges*.

(Filed: July 7, 2025)

James M. Brigman
Jeffrey S. Cashdan [ARGUED]
Allison H. White
King & Spalding
1180 Peachtree Street NE
Suite 1600
Atlanta, GA  30309

Nicole E. Bronnimann
King & Spalding
1100 Louisiana Street
Suite 4100
Houston, TX  77002

Paul A. Mezzina
Amy R. Upshaw
King & Spalding
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC  20006

    *Counsel for Appellants*

Adam G. Unikowsky
Jenner & Block
1099 New York Avenue NW
Suite 900
Washington, DC  20001

    *Counsel for Amicus Appellants Chamber of Commerce of
    the United States of America and American Property
    Casualty Insurance Association*

Stephanie A. Douglas
Nicole Haelterman
Susan M. McKeever
Bush Seyferth
100 W Big Beaver Road
Suite 400
Troy, MI  48084

   *Counsel for Amicus Appellant Lawyers for Civil Justice*

Joseph H. Bates, III
Edwin L. Lowther, III
Carney Bates & Pulliam
One Allied Drive
Suite 1400
Little Rock, AR  72202

Jacob L. Phillips [ARGUED]
Jacobson Phillips
2277 Lee Road
Suite B
Altamonte Springs, FL  32789

   *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

This is an interlocutory appeal under Federal Rule of Civil Procedure 23(f) in two consolidated suits against Progressive Specialty Insurance and Progressive Advanced Insurance (collectively, "Progressive"). Plaintiffs represent a class of drivers who, seeking coverage for their totaled vehicles, allege Progressive systematically underestimated the actual cash value of their cars and so breached its insurance agreements with them. The District Court certified two damages classes.

We conclude that proving whether Progressive undercompensated each class member is an individual issue incapable of proof on a class-wide basis. And because that individual issue is the dispositive question of Progressive's liability for breach of contract, we hold both classes fail to clear Rule 23(b)(3)'s requirement that common issues predominate over individual ones. So the District Court abused its discretion in certifying the classes. Accordingly, we will reverse and remand.

I.

Between 2018 and 2021, each named plaintiff in the putative classes filed a claim with Progressive after a car accident. In each instance, Progressive declared plaintiff's vehicle a total loss, triggering Progressive's contractual obligation to pay them the "actual cash value" ("ACV") of their totaled vehicle. That obligation derives from Progressive's "Pennsylvania Auto Policy," which states the ACV is "determined by the market value, age, and condition of the vehicle at the time the loss occurs." App. 117.

4

Plaintiffs allege Progressive's method of calculating each insured's ACV systematically underestimated that value. Specifically, plaintiffs contend that one component of Progressive's settlement valuation methodology, the "Projected Sold Adjustment" ("PSA")—which accounts for the fact that used cars often sell for less than dealers' listed prices—is categorically improper and should be omitted from the ACV calculation. Accordingly, plaintiffs, all of whom reside in Pennsylvania, sued on a state-law breach-of-contract theory.

## A.

As relevant here, Progressive's methodology for calculating a final settlement value that approximates a vehicle's ACV requires several steps.[1] Progressive's coverage policy permits it to use any evaluation "systems . . . developed by . . . a third party and may include computer software, databases, and specialized technology" in assessing ACV. App. 122. Here, that third party is Mitchell International, Inc. ("Mitchell"), and that system is Mitchell's WorkCenter Total Loss ("WCTL"), which generates a "dual source report." As its name suggests, that report uses two figures to reach its estimate, which represent the first two steps in Progressive's

---

[1] Progressive's methodology comports with the "Guide Source" method, which is one of the pre-approved valuation techniques under Pennsylvania insurance law. *See* 31 Pa. Code § 62.3(e)(1)(i). That method allows Progressive to "calculate the average of two figures reflecting the retail book value" of similar cars, "as provided by guide sources approved by the Commissioner." *Id.*

5

ACV calculation process. For the sake of ease, we call these two values the "Mitchell value" and the "NADA value."

First, Mitchell estimates a car's market value by averaging the list prices of comparable vehicles in the area and weeding out comparable vehicles whose list prices deviated substantially from that average. Mitchell takes the list prices of those comparable vehicles and applies to it a downward adjustment—the PSA. It does so as a way of approximating the ultimate sale price of a vehicle, in recognition of dealers' routine practice of negotiating down from the advertised price when attempting to sell the vehicle. But Mitchell does not apply a PSA to vehicles listed for sale at "no-haggle" or "one-price" dealerships that disallow price negotiation. Mitchell only applies a PSA to comparable vehicles that are not yet sold. The PSAs result in an average reduction in base market value of 6.7 percent, but Progressive emphasizes that a PSA is "*not a blanket reduction that is uniformly applied.*" App. Br. 14. Instead, the PSAs account for vehicle make, model, year, and where the insured resides, among other factors.

Second, Progressive obtains another valuation estimate—this one from the National Automobile Dealers Association ("NADA") Official Used Car Guide.[2] In essence, NADA starts with the car's NADA retail value—a regional value (e.g., Pennsylvania vehicles are assigned the NADA "Eastern" regional retail value) listed in the NADA guide. Similar to Mitchell's process, NADA adjusts the NADA retail

---

[2] NADA changed its name to J.D. Power Values in 2023, but in following the terminology of the litigation at the District Court, we use the older name.

6

value based on the sale prices of comparable vehicles, in recognition of the fact that vehicles' retail sale prices are lower than their initial asking prices. So NADA factors in vehicle-specific factors, including age, mileage, condition, prior damage, aftermarket parts, and refurbishment. The result is a NADA market value estimate—i.e., the NADA value.

Third, Progressive averages the Mitchell value and the NADA value, yielding the WCTL dual source base value. In summary, this value is the average of two estimates, each of which involves applying vehicle-specific adjustments to comparable vehicles' list prices as a way of approximating the totaled vehicle's sales price. Both components of the dual source base value are displayed in the vehicle valuation report.

Fourth, Progressive takes the WCTL dual source base value and adjusts it further for condition, prior damage, refurbishment, and value of aftermarket markets. Sometimes, the base value is adjusted even further by subtracting the salvage value if the insured elects to retain the totaled vehicle.

Accordingly, the final settlement value includes three types of adjustments: (1) the PSA, applied to the Mitchell base value; (2) NADA's adjustments to the NADA Eastern retail value; and (3) Progressive's final adjustments to the dual source base value. The final settlement value also subtracts any non-waived deductible specific to the insured's policy.

B.

Plaintiffs object to just the first of the three adjustments involved in Progressive's total loss settlement process. They contend the PSA should not be applied to the Mitchell base

7

value because it results in a lower final settlement value. If that final settlement value is less than ACV, then Progressive would be in breach of its form insurance contracts. Plaintiffs further allege Progressive's breach follows from its "manipulati[on of] the data used to determine the ACV of the vehicles." App. 55. Accordingly, plaintiffs pleaded breach of contract and actual damages on the basis of underpayment.

Furthermore, seemingly in support of their breach-of-contract claim, plaintiffs contend ACV calculations should exclude PSAs because those adjustments create "an outdated and false characterization of the market." Ans. Br. 6. According to Plaintiffs' expert, due to the rise in Internet advertising and sophisticated pricing tools, consumers know which dealerships are inflating their list prices and simply seek out dealerships who actually price to market. Plaintiffs raise a host of other issues with PSAs, but for our purposes, plaintiffs' arguments reduce to a promise that, at the merits stage, they can show the PSAs systematically undervalue ACV and thus result in underpayment.

Plaintiffs moved to certify two classes. Leon Drummond is the lead plaintiff of the Progressive Specialty Class, which has the following proposed definition:

> All Pennsylvania citizens insured by Progressive Specialty who, from the earliest allowable time through the date an Order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation *was based on a 'dual source' valuation report . . . prepared by Mitchell* and the ACV was decreased based upon Projected Sold

8

> Adjustments to the comparable vehicles used to determine ACV.

App. 67 (emphasis added). The second class, the Progressive Advanced Class, has the same definition word-for-word, other than that the word "Specialty" is replaced with the word "Advanced." App. 67. Plaintiffs Lee Williams and Yeshonda Driggins are the named representatives for that class.

The District Court then certified the classes, disposing of three Rule 23 objections by Progressive: commonality and predominance, superiority, and adequacy. *Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023 WL 5181596, at *12 (E.D. Pa. Aug. 11, 2023). The crux of the opinion—and the core issue on appeal—is predominance. Specifically, the court characterized plaintiffs' claims as challenging "the application of PSAs altogether." *Id.* at *10. That is, the putative class comprises insureds awarded improper total loss amounts that deviated from ACV, because Mitchell factored projected sale prices of the totaled vehicles into one component of the ACV formula, the court reasoned. The court continued, "Progressive maintains that PSAs are legitimate. The putative plaintiffs maintain they are inaccurate because they misrepresent current market behavior. It is this dispute, not the *individual* projected sale price of *each vehicle*, that is at the center of this action." *Id.* (emphasis added).

The District Court also held plaintiffs had Article III standing and rejected Progressive's argument that the possibility that a minority of the putative classes might have *benefited* from the PSAs posed a fundamental intraclass conflict that thwarted Rule 23(a) adequacy.

9

## II.

The District Court had jurisdiction under 28 U.S.C. § 1332(d). We have jurisdiction under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f), which provides that "[a] court of appeals may permit an appeal from an order granting or denying class-action certification." Fed. R. Civ. P. 23(f).

We "review a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (internal quotation marks omitted). "We exercise plenary review over a threshold question of law . . . ." *Neale v. Volvo Cars of N. Am.,* 794 F.3d 353, 358 (3d Cir. 2015).

## III.

Rule 23 sets forth the requirements for class certification. In addition to clearing the requirements of Rule 23(a), putative classes seeking damages must additionally satisfy the "twin requirements" of Rule 23(b)(3), *In re Hydrogen Peroxide*, 552 F.3d at 310, including that "questions of law or fact common to class members predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3). This predominance requirement is the core issue on appeal. The District Court characterized plaintiffs' claims as a challenge not to "the price for which PSAs predict each car will sell" but rather to "the application of PSAs altogether." *Drummond*, 2023 WL 5181596, at *10. Because the District Court improperly framed the predominance inquiry, we conclude it abused its discretion in certifying both classes.

10

Namely, the court failed to recognize that plaintiffs' theory of liability hinged on proving Progressive breached its insurance agreement with insureds by underpaying them for their totaled vehicles. And the court did not consider that many class members' breach-of-contract claims would be thwarted by their receipt of a final settlement value equivalent to or greater than ACV, in spite of Progressive's application of PSAs, as a consequence of other steps in the settlement methodology described above. The District Court would need to evaluate plaintiff-by-plaintiff proof to ascertain which plaintiffs Progressive actually underpaid and, accordingly, to which plaintiffs Progressive is liable for breach of contract.

A.

We begin with the District Court's erroneous framing of the predominance inquiry. Under the proper framing, the District Court should have analyzed whether common issues predominate over individual issues with respect to proving the elements of breach of contract. *See In re Hydrogen Peroxide*, 552 F.3d at 307 ("[We] must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on *elements of the cause of action*." (emphasis added)). But the District Court instead focused merely on the "legitimacy" of the PSAs. Reasoning that proving whether PSAs were applied to the class's vehicle valuations was easily supported by common evidence, the court stopped its predominance inquiry there. That analysis fell short of the Supreme Court's requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members" with respect to the "existence of individual injury." *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013).

11

1.

The Supreme Court in *Comcast* prescribed two distinct tracks for the predominance analysis: (1) Did the defendant cause injury that is capable of proof common to the class rather than to individual members? and (2) Are the damages stemming from that injury measurable on a class-wide basis by a "common methodology"? *Id.* The first track—the so-called liability prong—is at issue here. Under that prong, the District Court was required to assess whether "the existence of individual injury resulting from [Progressive's] alleged [breach of contract] . . . was capable of proof at trial through evidence . . . common to the class rather than individual to its members." *Id.* We have held that class certification is "unsuitable" when "proof of the essential elements of the cause of action requires individual treatment." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001) (citation and internal quotation marks omitted). "Accordingly, we examine the elements of plaintiffs' claim through the prism of Rule 23 to determine whether the District Court properly certified the class." *In re Hydrogen Peroxide*, 552 F.3d at 311 (citation and internal quotation marks omitted).

Specifically, of the state-law elements for breach of contract in Pennsylvania, breach and resulting damages are the liability issues Progressive contests on the merits. *See Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002). Both elements boil down to whether Progressive underpaid an insured by compensating them less than the ACV of their totaled vehicle. So plaintiffs would have to show at this dispositive step of the predominance analysis that they could prove Progressive's underpayment without relying on

12

plaintiff-by-plaintiff evidence.[3]

Instead, the District Court improperly characterized the predominance inquiry as boiling down to whether class-wide evidence could be used to prove whether "PSAs are legitimate." *Drummond*, 2023 WL 5181596, at \*10. The court summarized plaintiffs' complaint as averring that PSAs "misrepresent current market behavior" and "ACV should not be calculated based on projected sale prices, which is what applying PSAs does." *Id.* "It is this dispute, not the individual projected sale price of each vehicle, that is at the center of this action," the court concluded. *Id.* And earlier in its opinion, the court acknowledged Progressive's contention that "a breach only occurs if an insured is paid less than ACV"—and then promptly disagreed with that black-letter assertion. *Id.* at \*8-9. Specifically, the court first reasoned that "the case turns generally on whether Progressive's use of PSAs violated its contractual obligation to pay the proposed class members the ACV of their vehicles. *Id.* at \*9. But it then reiterated that, in its view, it need reach only one issue at the merits stage:

---

[3] The elements of the cause of action are not in the domain of *Comcast*'s second prong, which concerns the *calculation* of class damages, rather than the determination of actual damages a prerequisite to breach of contract. *See Neale*, 794 F.3d at 374-75; *see also Comcast* 569 U.S. at 42 (Ginsburg and Breyer, JJ., dissenting) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." (citation omitted)). For purposes of Rule 23(b)(3), then, plaintiffs must show they can prove Progressive underpaid insureds relative to the ACVs of their totaled vehicles.

whether "the use of PSAs . . . did or did not violate the contract." *Id.*

By its own reasoning, the District Court would have to find, on the merits, that even class members who were paid *above* ACV—despite use of PSAs—would still have a breach-of-contract claim against Progressive. But that would not constitute a breach here. Rather, the only way "PSAs . . . violate[d] the contract" is if, in the course of applying them during the multi-step final settlement valuation, Progressive paid an insured less than the ACV of their vehicle. *Id.*; *see Gorski*, 812 A.2d at 692.

2.

Under the proper framing, the District Court should have analyzed whether common issues predominate over individual issues with respect to proving the elements of breach of contract. Progressive could meet its contractual obligation to pay insureds their vehicles' ACV in several ways. Consider three scenarios: First, Progressive could scrap PSAs altogether, as plaintiffs urge, and pay the insured the average of the Mitchell base value—without a PSA—and the NADA value. This average could conceivably approximate ACV. Second, Progressive could follow its current methodology and average the Mitchell value (which includes a PSA) and the NADA value (which includes various NADA-specific adjustments)—as it actually does—but balance out (or even exceed) any intermediate downward adjustments with several upward adjustments at the final step of the settlement calculation. Third, the NADA value could be higher than the Mitchell value, resulting in a final settlement value which, depending on any final adjustments, could match or exceed

14

ACV.  This third situation is not uncommon, according to the sworn affidavit of Progressive's insurance expert.  Contrary to plaintiffs' argument that only the first scenario would preclude a breach-of-contract claim, *any* of these approaches would allow Progressive to meet its contractual obligation to pay ACV.

The second scenario was squarely addressed by the Ninth Circuit in *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022).  There, Liberty Mutual applied a *uniform* downward adjustment to its initial estimate of totaled vehicles' ACV.  *Id.* at 1136.  The court noted, however, that after applying that downward adjustment, Liberty would often "reverse[] the negative adjustment and sometimes even appl[y] a positive adjustment." *Id.* at 1137.  This practice of undoing the downward adjustments undermined putative plaintiffs' breach-of-contract theory, the court held, because "if a putative class member was given [the car's ACV] or more, then he or she cannot win on the merits." *Id.* at 1139.  Why?  Because "[t]o win on the merits of breach of contract, plaintiffs must show that the breach proximately causes damage to the [plaintiff]." *Id.* (citation and internal quotation marks omitted) (alteration in original).  The *Lara* court also held the putative class lacked predominance on the same grounds, reasoning that "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person." *Id.*

Likewise here.  Just because Progressive applies PSAs to the Mitchell list prices to arrive at the Mitchell value does not mean insureds are not being paid ACV.  Progressive could have properly compensated class members *while* employing the PSAs.

15

Consider, again, Progressive's settlement calculation process. The WCTL dual source base value is the average of the Mitchell value and the NADA value. Systematically decreasing one of those two base value components would always decrease the base value, as plaintiffs emphasize. And after further adjustments to that base value, Progressive arrives at the final settlement value it pays to insureds. So systematically decreasing the Mitchell value would always mean a lower final settlement value. That is, if we accept plaintiffs' allegation that Progressive manipulated the Mitchell value by applying improper downward adjustments to it, the final settlement value would always be lower than *what it otherwise would have been*. But that is not what matters for purposes of breach of contract. Rather, what matters is whether the decrease in the Mitchell value led to the final settlement value dropping below the *true ACV* of the totaled vehicle— because that is what Progressive is contractually obliged to pay insureds. For example, imagine a class member whose NADA value exceeded the Mitchell value such that their average offset any PSA applied to the Mitchell value. That is the third scenario mentioned above. Or what if Progressive's final-step adjustments to the WCTL dual source base value offset the PSA? That is the second scenario, as well as Liberty Mutual's practice addressed in *Lara*. In each hypothetical, the insured has suffered no actual injury. Just because the Mitchell value decreased does not mean the resulting final settlement value was less than the *true* ACV of the vehicle.[4]

---

[4] *Accord Lara*, 25 F.4th at 1139 ("[T]his class could include a plaintiff whose car was valued using the CCC report with the disputed condition adjustment, and for whom Liberty used CCC's estimate without making any further adjustments.

16

We conclude that, contrary to plaintiffs' argument that the only way for Progressive to avoid breach of contract is by eliminating PSAs, Progressive could conceivably meet its contractual duty to pay ACV notwithstanding the application of those adjustments in determining just one component of a vehicle's final settlement value.

B.

With the proper framing of the predominance inquiry on Progressive's liability, we now apply that inquiry to the putative classes. Individual issues are those "where members of a proposed class will need to present evidence that varies from member to member," and common issues are those where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks omitted) (quoting 2 *Newberg on Class Actions* § 4:50 (William Rubenstein ed., 5th ed. 2012)).

Although "the presence of individual questions does not *per se* rule out a finding of predominance," *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998), and "[i]ndividual questions need not be absent," *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012), a putative class fails to clear the predominance requirement when a district court "formulate[s]

---

Even for that plaintiff, the district court would have to look into the actual value of the car, to see if there was an injury.").

some prediction as to how specific issues will play out . . . in a given case," *In re Hydrogen Peroxide*, 552 F.3d at 311 (citation omitted), and concludes it "cannot be adequately assured that individualized evidence will not later overwhelm the case and render it unsuitable for class-wide adjudication," *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 305 (3d Cir. 2016). "This analysis will often resemble a merits determination, in that it relates to plaintiffs' ability to prove the elements of their claims." *Id.* And we must be "pragmatic" in our "assessment of the entire action and all the issues involved." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (internal quotation marks omitted) (quoting 5 *Moore's Federal Practice* § 23.45[1] (3d ed. 2008)).

We conclude that identifying whether each class member was actually paid less than true ACV is an individual question. Rule 23(b)(3) requires that plaintiffs prove this core issue of underpayment—on which both breach and damages in their breach-of-contract claim turn—with class-wide proof. Plaintiffs cannot meet that burden. And because proving the underpayment issue is essential to Progressive's alleged liability for breach of contract, we believe that "individualized evidence" of whether each class member's vehicle's ACV was greater than the final settlement value would "overwhelm the case." *Harnish*, 833 F.3d at 305. Accordingly, because "proof of the essential elements of [plaintiffs'] cause of action requires individual treatment," common issues as to Progressive's liability do not predominate. *In re Hydrogen Peroxide*, 552 F.3d at 311 (citation omitted).

Our conclusion is apparent from plaintiffs' proposed class definitions—each runs squarely into the actual-underpayment issue. Namely, each definition is inclusive of

18

only those insureds whose "*ACV* was *decreased* based upon Projected Sold Adjustments." App. 67 (emphasis added). The definition's use of the term "actual cash value" cannot mean the true ACV of a vehicle, because that is an absolute, static value that cannot be "decreased." Rather, plaintiffs presumably meant "final settlement value," which Progressive guarantees equates to the insured vehicle's true ACV. Indeed, plaintiffs use the term "ACV" interchangeably with final settlement value. *See, e.g.*, App. 66-67.

Per the class definition, then, the class could include insureds whose final settlement values decreased as a consequence of PSAs yet still did not drop below the vehicle's true ACV. Plaintiffs cannot prove breach without first proving Progressive's final settlement value in a class member's vehicle valuation report was lower than true ACV. Accordingly, each class would have to bring in necessarily individual proof, plaintiff-by-plaintiff, to determine which were undercompensated.

In a recent case, the Ninth Circuit similarly scrutinized the class definitions in litigation against State Farm. *See Jama v. State Farm Mutual Auto. Ins. Co.*, 113 F.4th 924, 931-36 (9th Cir. 2024). There, the district court declined to certify two classes, each challenging a distinct adjustment State Farm made to the value of class members' totaled vehicles. *Id.* at 926. The "negotiation" adjustment, like the PSA here, captures the "typical amount buyers may negotiate down the price of a replacement car" at the dealership. *Id.* The "condition" adjustment accounts for the typically worse condition of used cars. *Id.* The *Jama* plaintiffs alleged the "negotiation" adjustment is unlawful under a Washington statute that sets

19

forth guidelines for the calculation of ACV.[5]  *Id.* at 931.  The court, speaking through Judge Rakoff sitting by designation, concluded, "*All* members of the negotiation class . . . *received less than they were owed* in the exact amount of the impermissible negotiation deduction."  *Id.* at 933 (emphasis added).    Accordingly, because the negotiation class was *defined* clearly as those insureds who were "paid the value determined in [the valuation] report *with the negotiation discount applied*," *id.* at 931 (emphasis added), the court reversed the denial of certification for that class only, *id.* at 935. But the court went the other way on the condition class, holding that the adjustment at issue there—whose legality plaintiffs did not contest—did not necessarily result in a uniform downward adjustment in final settlement values.  *Id.*  Rather, the "[condition] class definition alone does not exclude the plaintiff . . . whose payout nonetheless equaled or exceeded their pre-cash car's actual cash value."  *Id.* (citation and internal quotation marks omitted).

The *Jama* court's conclusion that "there is no way to know as to any individual class member in the condition class whether their actual payout was more, less, or equal to what State Farm *could* lawfully have paid if it had calculated a

---

[5] No such statute is on the books in Pennsylvania.  Here, plaintiffs proceed on a breach of contract theory, alleging systemic undervaluation of ACV, which Progressive is contractually obligated to pay to insureds.  Washington law, however, explicitly permits the condition adjustment, so the *Jama* plaintiffs contended instead that State Farm's condition adjustments "lack[ed] sufficient empirical foundation."  *Jama*, 113 F.4th at 928.

condition adjustment appropriately," *id.* at 936, is relevant here. We do not know whether each insured whose Mitchell value was reduced by a PSA received an "actual payout [that] was more, less, or equal to what [Progressive] could lawfully have paid" if it had omitted PSAs. *Id.* (alteration in original). "There is therefore no way to know without individualized inquiry whether such a class member received less than their car's actual cash value and therefore suffered any injury." *Id.*

In sum, just because Progressive's final settlement value could have been higher but for the use of the PSA does not mean that a given insured was actually underpaid. And if an insured was not underpaid, then Progressive did not breach its contract with that insured.[6] Accordingly, individual issues

---

[6] A pair of amici make this argument directly. The U.S. Chamber of Commerce and the American Property Casualty Insurance Association contend that "[f]or every class member, the determination of whether Progressive breached the contract would still require an individualized analysis of whether the amount of money the class member received is lower than ACV." Chamber Amicus Br. 7. They continue,

> [E]ven if Plaintiffs were to prove, following class certification, that PSAs rest on outdated assumptions about the market for used cars, that fact would teach precisely nothing about whether Progressive is *liable* to any particular class member. For every single class member, the court would still have to ask the question: was the payment *in fact lower* than ACV? That question would depend on individualized

21

predominate as to whether the putative class members actually received less than ACV. Since the District Court's conclusion as to Rule 23(b)(3) predominance "rest[ed] upon . . . an errant conclusion of law," *In re Hydrogen Peroxide*, 552 F.3d at 312 (citation omitted), the classes must be decertified.

## C.

Because we hold the classes failed to satisfy Rule 23(b)(3)'s predominance requirement, we need not reach Progressive's alternative argument that the classes presented a fundamental intraclass conflict in violation of Rule 23(a)(4)'s adequacy requirement.

Furthermore, Progressive's challenge to commonality under Rule 23(a)(2) is unavailing. To prove the classes here raise "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), plaintiffs need only "demonstrate that the class members have suffered the same injury." *Wal-Mart*

---

evidence regarding the characteristics of the class member's particular car.

*Id.* at 7-8 (emphasis added). The question these amici pose is the crux of the predominance problem here—whether the final settlement value is *in fact lower* than the (true) ACV. Answering that question would require the court "to review particularized evidence with respect to every putative class member" before determining whether Progressive breached its contract with each member. *Id.* at 8; *see also Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 186 (3d Cir. 2019).

22

*Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 (1982)). Best framed, the common question here is whether insureds were underpaid relative to their ACV, as a crucial element of Progressive's liability for breach of contract. We have already explained why proving underpayment is impossible without individualized inquiries for purposes of the predominance requirement, which is ultimately more exacting than the commonality requirement. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997) ("Even if Rule 23(a)'s commonality requirement may be satisfied by [plaintiffs'] shared experience, the predominance criterion is far more demanding."); *see also Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019); *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) ("Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement . . . ."); *In re Hydrogen Peroxide*, 552 F.3d at 311 (3d Cir. 2008).

Lastly, Progressive contends the class cannot demonstrate common issues predominate as to standing, in addition to liability. As a threshold matter, we note Progressive does not contest class standing as a whole. *See* App. Br. 31 n.4 ("To be clear, Progressive does not dispute that the named plaintiffs determine standing for the case as a whole." (citation and internal quotation marks omitted)). Nor could it. "[W]e have held that the cases or controversies requirement is satisfied so long as a class representative has standing, whether in the context of a settlement or litigation class." *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 154 (3d Cir. 2023) (internal quotation marks omitted) (quoting *Neale*, 794 F.3d at 362). Here, the named plaintiffs all claim they were undercompensated, and on the record before us, we lack

any basis to find their vehicle valuations included mitigating upward adjustments that would balance out their PSAs and destroy injury-in-fact. *Cf. Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 457, 460-61 (3d Cir. 2024) (holding Geico's application of an upward adjustment to named plaintiff's vehicle valuation that entirely offset challenged downward adjustment defeated class standing). And we need not decide whether the possibility that some class members' final settlement values were the equivalent of or exceeded ACV would create a predominance issue with respect to standing. We rest our disposition on the conclusion that, with respect to liability for breach of contract, the putative classes cannot prove breach and damages without overly individualized inquiries. Accordingly, the putative classes are not "sufficiently cohesive to warrant adjudication by representation." *Tyson Foods*, 557 U.S. at 453 (citation omitted). That is enough to bar class certification.

IV.

The purpose of Rule 23(b)(3)'s predominance requirement "is to determine whether 'a class action would achieve economies of time, effort, and expense and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 336 (3d Cir. 2011) (Scirica, J., concurring) (quoting *Amchem,* 521 U.S. at 615). Courts must scrutinize the elements of plaintiffs' cause of action in determining whether liability issues at the merit stage will be capable of common proof. *See In re Hydrogen Peroxide*, 552 F.3d at 311 ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable. Accordingly, we examine the elements of plaintiffs' claim

through the prism of Rule 23 . . . .” (citations and internal quotation marks omitted)).

As the Ninth Circuit concluded, when a particular downward adjustment in an insurance valuation is both statutorily unlawful and uniform, proving damages incurred by each plaintiff because of that adjustment is straightforward. *See Jama*, 113 F.4th at 932 (“Plaintiffs contend that Washington law flatly prohibits *any* negotiation adjustment; and if Plaintiffs are correct about that legal issue, then each Plaintiff suffered damages equal to the amount of the negotiation adjustment that State Farm made.”). Here, by contrast, plaintiffs brought a contract claim, so they must show that proving whether Progressive breached its insurance agreement with each class member does not require a plaintiff-by-plaintiff determination as to underpayment. Because they cannot make that showing, we will reverse the District Court’s order certifying the classes and remand for further proceedings consistent with this opinion.